## BEFORE THE UNITED STATES JUDICIAL PANEL ON
## MULTIDISTRICT LITIGATION

| | | |
|---|---|---|
| **In re Aqueous Film-Forming** | ) | **MDL No. 2873** |
| **Foams (AFFF) Products Liability** | ) | |
| **Litigation** | ) | |

---

### CITY OF WESTFIELD, MASSACHUSETTS' AND COUNTY OF BARNSTABLE, MASSACHUSETTS' RESPONSE IN OPPOSITION TO TYCO/CHEMGUARD'S AND 3M COMPANY'S MOTIONS FOR TRANSFER OF ACTIONS PURSUANT TO 28 U.S.C. § 1407 FOR COORDINATED OR CONSOLIDATED PRETRIAL PROCEEDINGS

---

## I.     INTRODUCTION

City of Westfield, Massachusetts ("Westfield") and County of Barnstable, Massachusetts ("Barnstable"), through their attorneys, submit this response to Tyco/Chemguard's Motion for Transfer of Actions to the District of Massachusetts Pursuant to 28 U.S.C. § 1407 for Coordinated Pretrial Proceedings, *In re Aqueous Film-Forming Foams (AFFF) Prods. Liab. Litig.* (MDL 2873) [ECF No. 1], and 3M Company's Second Motion for Transfer of Actions Pursuant to 28 USC § 1407 for Coordinated Pretrial Proceedings and Joinder in the Tyco/Chemguard Defendants' Motion for Transfer. *Id.* [ECF No. 4].

The damages in all of the cases subject to Defendants' transfer motions stem from Defendants' manufacture of toxic per- and polyfluoroalkyl substances ("PFAS"), the introduction of PFAS into the marketplace, the use of PFAS in certain products such as Aqueous Film-Forming Foams ("AFFF") and/or the direct discharge of PFAS into the environment.  PFAS are a class of chemicals that include perfluorooctanesulfonic acid ("PFOS") and perfluorooctanoic acid ("PFOA").  PFAS are characterized by a carbon-fluorine bond that is one of the strongest chemical bonds that occur in nature.  PFAS are extremely stable and resistant to metabolic and environmental degradation, are extremely persistent in the environment and in the human body,

and bioaccumulate and biomagnify in humans and wildlife.  PFAS are water soluble and can migrate readily from soil to groundwater.  PFAS are linked to a number of human diseases including kidney cancer and testicular cancer. *In re E.I. du Pont de Nemours & Co. C-8[1] Pers. Injury Litig*. ("*In re C-8*"), 314 F. Supp. 3d 868, 869-0 (S.D. Ohio 2014) (Sargus, J.) (discussing *Leach v. E.I. du Pont de Nemours & Co*., No. 01-C-698 (Wood Cty. W. Va. Cir. Ct.) where the class settlement included the creation of a science panel to study the toxic effects of PFOA exposure and which linked such exposure to six specific human diseases).  Plaintiffs, including Westfield and Barnstable, allege that Defendants manufactured, distributed or used PFAS or introduced products into the marketplace containing PFAS with full knowledge of the toxic properties of PFAS and failed to warn plaintiffs or the public of the dangers associated with PFAS and, specifically, the propensity of PFAS to contaminate drinking water supplies and cause various other types of damage.

For the reasons set forth below, Westfield and Barnstable support the transfer of their cases to a suitable jurisdiction for pretrial proceedings pursuant to 28 U.S.C. § 1407 and also support the inclusion of *all* PFAS related cases as requested by 3M and *not* just AFFF cases as requested by Tyco/Chemguard.  However, Westfield and Barnstable respectfully object to the transfer of the cases identified by Tyco/Chemguard and 3M to the District of Massachusetts or the Southern District of New York.  Instead, Westfield and Barnstable submit that the jurisdiction best suited to manage these cases, as discussed below, is the Southern District of Ohio and that the judge with the most experience with the legal, scientific and evidentiary issues relating to PFAS litigation is the Honorable Chief Judge Edmund A. Sargus, Jr.

---

[1] PFOA and PFOS are made up of "chains" of eight carbon atoms that are attached to fluorine and other atoms. https://www.epa.gov/pfas/basic-information-pfas.  Internally, DuPont referred to PFOA as "C-8." *See Bartlett v. E.I. du Pont de Nemours & Co. (In re C-8)*, 2015 U.S. Dist. LEXIS 11731, at *1108 (Aug. 31, 2015) (Sargus, J.).

## II.  ARGUMENT

### A.    Consolidating the Pending Cases is Appropriate Because There are Common Issues of Fact and Law.

As the moving parties have explained in detail, the cases presently before the Panel (and expected "tag along" cases) involve common questions of fact and law, and centralization of and coordination among the cases at this stage would likely prove convenient for the Parties and conserve judicial resources. Tyco/Chemguard's Mem. in Support of Mot. for Transfer of Actions to the Dist. of Mass. Pursuant to 28 USC § 1407 for Coordinated Pretrial Proceedings (MDL 2783) ("Tyco Mem.") [ECF No. 1-1] at 6-11; 3M Co.'s Mem. in Support of its Second Mot. for Transfer of Actions Pursuant to 28 USC § 1407 for Coordinated Pretrial Proceedings & Joinder in the Tyco/Chemguard Defs.' Mot. for Transfer ("3M's Mem.") [ECF No. 4-1] at 5-8.  Thus, it would be proper, pursuant to 28 U.S.C. § 1407, for the Panel to transfer the cases to one district court for coordinated pretrial proceedings.  To this end, Westfield and Barnstable both consent to a MDL that involves *all* PFAS cases.

### B.    The Transferee Court Will Have Wide Discretion to Manage the Litigation.

Even though the pending cases share common issues of fact and law and are well-suited for consolidation, the nature and extent of the harms caused by Defendants to each of the plaintiffs that have brought suit make this litigation somewhat unique.  Defendants' conduct has devastated communities and public drinking water supplies throughout the country and local governments and other public drinking water suppliers are facing the need and obligation to act on behalf of those communities.

Although the current category of plaintiffs may be different (*e.g.*, public water suppliers and individuals) there are common issues relating to all the cases contained in the instant motions. For example, almost every case contains a cause of action for negligence which will require the plaintiff to prove the existence of a duty which necessarily relates to knowledge. *See*, *e.g.*, *In re C-*

3

*8*, 2015 U.S. Dist. LEXIS 110393, at *1071 (Aug. 19, 2015) (Sargus, J.) (holding in PFAS MDL litigation that "the existence of a duty derives from the foreseeability of the injury, which usually depends upon the defendant's knowledge.") (citation omitted); *see also In re C-8*, 2016 U.S. Dist. LEXIS 19880, at *1199-1200 (Feb. 17, 2016) (Sargus, J.) ("The evidence of [PFAS'] biopersistence and [defendant's] knowledge of [PFAS'] biopersistence, coupled with the additional evidence presented at trial, supports the jury's conclusion that [defendant] owed [the plaintiff] a duty.").

Likewise, the product liability claims will require the plaintiffs to prove, among other things, that "the foreseeable risks of harm posed by [AFFF] could have been reduced or avoided by the provision of reasonable instructions or warnings . . . ." *Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 635 (2012) (citing Restatement (Third) of Torts: Products Liability § 2(c) (1997)). Therefore, Defendants' knowledge relating to the foreseeable harms posed by AFFF will also have to be proved by every plaintiff whose complaints include these causes of actions.

In this regard, Barnstable and Westfield make the following allegations relating to knowledge and foreseeable harm in their respective complaints and will need to conduct discovery relating to these issues:

- Throughout the 1950s, 3M's own internal animal studies consistently concluded that PFASs are "toxic."
- A 1956 study at Stanford University concluded that PFAS manufactured by 3M bind to proteins in blood.
- 3M knew as early as the mid-1950s that PFAS accumulate in humans and animals.
- By the early 1960s, 3M understood that PFAS are stable and persist in the environment and that they do not degrade.
- According to a deposition transcript from a lawsuit brought by the State of Minnesota against 3M (No. 27-cv-10-28862 (4th Judicial Dist. Ct. Hennepin Cty.)) for damages to the state's natural resources from PFAS, 3M began monitoring the blood of its employees for PFAS, as early as 1976, because the company was "concerned" about "health" effects of PFAS.  3M documents from 1977 relating to these worker tests further confirmed that PFASs bioaccumulate.
- A 1978 study by 3M on PFOS and PFOA confirmed that "these chemicals are likely to persist in the environment for extended periods unaltered by microbial catabolism."

4

- Studies undertaken by 3M in the 1970s demonstrated that PFAS were even "more toxic than was previously believed."
- A technical journal in 1970 observed after conducting tests on a 3M product containing PFAS that the product was "highly derogatory to marine life and the entire test program had to be abandoned to avoid severe local stream pollution."
- In 1979, a 3M scientist recognized in Interoffice Correspondence that PFAS posed a cancer risk because they are "known to persist for a long time in the body and thereby give long-term chronic exposure."

Furthermore, Westfield and Barnstable (as well as other plaintiffs) will introduce evidence supporting their claims for punitive damages that shows that Defendants "purposefully manipulated or used inadequate scientific studies to support [their] position . . . about the dangers of [PFAS]." *In re C-8*, 2015 U.S. Dist. LEXIS 110391, at *1143-44 (S.D. Ohio Aug. 19, 2015) (Sargus, J.).  For example, in support of their claims for punitive damages, Westfield and Barnstable allege the following:

- Despite 3M's understanding of the risks associated with PFAS, 3M engaged in a campaign to distort scientific research concerning PFASs and to suppress research into the potential harms associated with PFAS.
- According to deposition testimony, 3M recognized that if the public and governmental regulators became aware of the risks associated with PFAS, 3M would be forced to halt its manufacturing of PFAS and PFAS-derived products that would result in the loss of hundreds of millions of dollars in annual revenue.
- The potential loss of 3M's massive profits from PFAS drove 3M to engage in a campaign to influence the science relating to PFAS and, according to internal 3M documents, to conduct scientific "research" that it could use to mount "[d]efensive [b]arriers to [l]itigation."
- A key priority of an internal 3M committee—referred to as the FC Core Team—was to "[c]ommand the science" concerning "exposure, analytical, fate, effects, human health and ecological" risks posed by PFAS and for 3M to provide "[s]elective funding of outside research through 3M 'grant' money."
- In exchange for providing grant money to friendly researchers, 3M obtained the right to review and edit draft scientific papers regarding PFAS and sought control over when and whether the results of scientific studies were published at all.
- A significant aspect of 3M's campaign to influence independent scientific research involved 3M's relationship with Professor John Giesy.  3M provided millions of dollars in grants to Professor Giesy, who presented himself publicly as an independent expert but, as revealed in his deposition testimony he privately characterized himself as part of the 3M "team."
- According to Professor Giesy's deposition testimony, Professor Giesy worked on behalf of 3M to "buy favors" from scientists in the field for the purpose of entering into a "quid pro quo" with the scientists.

5

- According to emails produced by Professor Giesy, through his position as an editor of academic journals, Professor Giesy reviewed "about half of the papers published in the area" of PFAS ecotoxicology and billed 3M for his time reviewing the articles and, in performing reviews of these articles, Professor Giesy stated that he was always careful to ensure that there was "no paper trail to 3M" and that his goal was to "keep 'bad' papers [regarding PFAS] out of the literature" because "in litigation situations" those articles "can be a large obstacle to refute."

- According to Professor Giesy's deposition testimony, despite spending most of his career as a professor at public universities, Professor Giesy has a net worth of approximately $20 million which is, according to the Minnesota Attorney General, in part, a direct result from his long-term involvement with 3M for the purpose of suppressing independent scientific research on PFAS.

- An EPA internal memo on the day of 3M's phase-out announcement stated: "3M data supplied to EPA indicated that these chemicals are very persistent in the environment, have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term . . . . *[PFOS] appears to combine Persistence, Bioaccumulation, and Toxicity properties to an extraordinary degree.*" (emphasis added).

In addition to Westfield and Barnstable, the discovery that is relevant to the above allegations will be needed by virtually every plaintiff. Coordinated discovery through the creation of a MDL will streamline the discovery process by reducing the number of times that Defendants will have to respond to document requests and by reducing the number of witnesses that will have to sit for depositions. Indeed, in the absence of a MDL, Professor Giesy – for example - may be forced to testify at many different times in hundreds of separate cases.

Also, to the extent there are individualized issues, this panel has noted many times that a transferee court has wide discretion to manage the consolidated action to protect both the common and individual issues. *In re Nat'l Prescription Opiate Litig.*, 290 F. Supp. 3d 1375, 1378-79 (J.P.M.L. 2017); *see also*, *In re Proton- Pump Inhibitor Prod. Liab. Litig.* (No. II) (MDL No. 2789), 2017 WL 3309647, at *2 (J.P.M.L. Aug. 2, 2017) ("As we repeatedly have stated, a transferee judge can employ any number of techniques, such as establishing separate discovery and motion tracks, to manage pretrial proceedings efficiently."); *In re Mirena IUS Levonorgestrel-Related Prod. Liab. Litig.* (No. II), 249 F. Supp. 3d 1357, 1360 (J.P.M.L. 2017) ("[T]he transferee

judge possesses broad discretion to formulate a pretrial program that accounts for any significant differences among the actions and ensures that duplicative activity is minimized or eliminated."). In addition, the transferee judge may recommend § 1407 remand of particular actions or claims in advance of other actions or claims. *See In re EpiPen Mktg.*, 268 F. Supp. 3d 1356, 1359 (J.P.M.L. 2017) (citing *In re McCormick & Co., Inc., Pepper Prod. Mktg. & Sales Practices Litig.*, 148 F. Supp. 3d 1364, 1366 (J.P.M.L. 2015)).

Precisely how to manage and structure the litigation to ensure that the many unique concerns of the various plaintiffs are addressed will be in the capable hands of the transferee court. As discussed below, Barnstable and Westfield believe that, given his background and experiences, Chief Judge Sargus from the Southern District of Ohio would be particularly sensitive to tailoring his management of the litigation to account for these interests.

C.      **Chief Judge Sargus Would Ably Manage the PFAS Cases.**

The Panel should transfer and consolidate the pending cases before Chief Judge Sargus.  As discussed below, Chief Judge Sargus and the Southern District of Ohio are ideally suited to handle these cases and the complex coordination they will require.

1.      **The Southern District of Ohio is a convenient venue for consolidated proceedings.**

Located in Columbus, Ohio, the Southern District of Ohio is an easily reachable venue, with regular flights from all mid-size and large airports across the country.  The John Glenn Columbus International Airport is located only six miles east of downtown Columbus and offers nonstop flights to more than forty destinations.  Additionally, because Columbus is such a large metropolitan area (its population is 860,090) and the state's capital, there are ample hotels with easy-to-use and efficient transportation.  And the courthouse is conveniently located in downtown Columbus.

Because of the scope of the defendants' contamination and pending litigation, witnesses and cases are not concentrated in any single district or region and instead are spread throughout the entire country.  For example, some plaintiffs are located on the east coast (*e.g.* Barnstable and Westfield in the District of Massachusetts), some on the west coast (*e.g. Ackerman et al. v. 3M Co.*, No. 2:18-cv-00117 in the Eastern District of Washington), some in the Colorado Rockies (*Bell et al. v. 3M Co.*, No. 1:16-cv-02351 in the District of Colorado), some in the northern mid-west (*City of Lake Elmo v. 3M Co.*, No. 0:16-cv-02557 in the District of Minnesota) and some in the South (*Emerald Coast Utilities Auth.*, No. 3:18-cv-01445 in the Northern District of Florida).

Similarly, the main defendants' headquarters are not concentrated in one location and are *closer* to the Southern District of Ohio than the two jurisdictions recommended by Tyco/Chemguard and 3M.  For example, 3M is headquartered in Minneapolis (a short non-stop flight to Columbus offered four times daily on weekdays), Tyco/Chemguard is located in Wisconsin and Buckeye Fire Equipment Company is located in North Carolina.

> ## 2.    The Southern District of Ohio is well-equipped to manage the PFAS litigation.

The Southern District of Ohio has handled significantly more PFAS cases than any other jurisdiction.  Indeed, Chief Judge Sargus was assigned *In re C-8* which was comprised of over 3500 individual plaintiffs who were exposed to PFAS through their drinking water provided to them by six separate public drinking water suppliers.  The case of *The Little Hocking Water Ass'n., Inc. v. E.I. du Pont de Nemours & Co*., No. 2:09-cv-1081 (Marbly, J.) was also litigated in the Southern District of Ohio.  *Little Hocking* involved the contamination of a public drinking water supply with PFAS and included common law and federal environmental statutory claims; very

similar to the numerous water district cases that would be subject to this MDL[2].  Additionally, the

State of Ohio has been at the forefront of PFAS litigation being the second state in the country to

file suit in response to PFAS contamination of its natural resources.[3]  The City of Dayton also

recently filed suit in the Southern District of Ohio for PFAS contamination of its public drinking

water supplies, *City of Dayton, Ohio v. 3M Co.*, No. 3:18-cv-00331 (S.D. Ohio) and a national

PFAS class action was recently filed as well. *Hardwick v. 3M Co.*, No. 2:18-cv-1185 (S.D. Ohio).

Both of these cases were assigned to Chief Judge Sargus.

>    **3.      Chief Judge Sargus is eminently qualified to manage this multidistrict litigation.**

Chief Judge Sargus has been a judge for twenty-two years, during which he has

distinguished himself as a preeminent jurist.  Prior to his appointment as a federal judge, Chief

Judge Sargus served as the United States Attorney for the Southern District of Ohio.  Chief Judge

Sargus has also served as Special Counsel to the Ohio Attorney General and was a solicitor for a

number of Ohio municipalities.  In January 2015, he became the Chief Judge of the Southern

District of Ohio.  In addition to his PFAS experience, Chief Judge Sargus' experience as a United

States Attorney and a municipal attorney is particularly relevant here.  These experiences give him

an appreciation for the special role that local governments, like many that are before the Panel here

such as Barnstable and Westfield, play in protecting their citizens from the kinds of harms alleged

in this litigation.

---

[2] Currently, the following water district cases, in addition to Barnstable and Westfield, are subject
to this MDL: *West Morgan-East Lawrence Water & Sewer Auth. v. 3M Co.*, No. 5:15-cv-01750
(N.D. Ala.); *City of Lake Elmo v. 3M Co.*, No. 0:16-cv-02557 (D. Minn.); *Suffolk Cty. Water Auth.
v. 3M Co.*, No. 2:17-cv-06982 (E.D.N.Y.); *Hampton Bays Water Dist. v. 3M Co.*, No. 2:18-cv-
01996 (E.D.N.Y.); *Emerald Coast Utils. Auth. v. 3M Co.*, No. 3:18-cv-01445 (N.D. Fla.); *City of
Newburgh v. United States*, No. 7:18-cv-07057 (S.D.N.Y.); *City of Dayton v. 3M Co.*, No. 3:18-cv-
00331 (S.D. Ohio).
[3] The first case was filed by the State of Minnesota and settled in February 2018 for $850 million.
*Minn. v. 3M Co.*, No. 27-cv-10-28862 (4th Judicial Dist. Ct. Hennepin Cty).

Chief Judge Sargus has already demonstrated his knowledge and skill in managing complex PFAS MDL litigation in *In re C-8*.  During the pendency of *In re C-8* (MDL 2433) (which contains over 5100 docket entries), Chief Judge Sargus issued twenty-four case management orders, forty-seven pretrial orders, twelve discovery orders, twenty-nine dispositive motions orders, twenty-four evidentiary (*Daubert*) motions orders, ruled on 142 motions *in limine* and oversaw four bellwether trials - three of which went to verdict.  Under Chief Judge Sargus' case management, a global resolution was reached between plaintiffs and the defendant for $671 million in February 2017.  Chief Judge Sargus' experience with the legal, evidentiary and scientific issues in PFAS cases is, without exception, unparalleled.

Chief Judge Sargus' leadership on the C-8 MDL shows both his ability to address and manage large and complex legal issues, as well as his knowledge of the legal and scientific issues involved in PFAS cases.  As the Panel has previously held, a Judge's experience with MDLs and the specific issues that form the basis of the cases subject to transfer is one of the most important factors for the Panel to consider when selecting the proper jurisdiction and judge for pretrial proceedings pursuant to 28 U.S.C. § 1407. *See*, *e.g.*, *In re Pella Corp. Architect & Designer Series Windows Mktg.*, 996 F. Supp. 2d. 1380, 1383 (J.P.M.L. 2014) (selecting Judge Norton because of his experience in overseeing a related MDL); *In re Neurontin Antitrust Litig.*, 217 F. Supp. 2d. 1380, 1381 (J.P.M.L. 2002) (selecting Judge Lifland "who has already gained considerable experience with the issues present in this docket as a result of presiding over another [MDL]"); *In re Disposable Contact Lens Antitrust Litig.*, 109 F. Supp. 3d 1369, 1371 (J.P.M.L. 2015) (selecting Judge Sclesinger because of his familiarity with the relevant issues "by virtue of his experience presiding over a previous MDL involving [similar issues]."); *In re Oil Spill by the Oil Rig "DeepWater Horizon,"* 731 F. Supp. 2d 1352, 1355 (J.P.M.L. 2010) (selecting Judge Barbier, in part, because of his considerable MDL experience and familiarity with the cases); *In re*

*Armodafinil Patent Litig.*, 755 F. Supp. 2d 1359, 1360 (J.P.M.L. 2010) (assigning patent MDL to Judge Sleet because of his "particular experience with MDL patent litigation"); *see also In re Colgate-Palmolive Softsoap Antibacterial Hand Soap Litig.*, 847 F. Supp. 2d 1381, 1382 (J.P.M.L. 2012) (concluding that the District of New Hampshire is appropriate transferee district because the issues are similar to another MDL in that District).

### 4.    Westfield's case and Barnstable's case are in their initial stages

Contrary to the Moving Parties' description of Westfield's case and Barnstable's case, neither are "well into the litigation process." Tyco/Chemguard Mem. at 3; 3M Mem. at 9.  To the contrary, both cases are in their initial stages of litigation and the transfer to the Southern District of Ohio would *not* create an undue hardship on any of the parties.

Barnstable filed suit against 3M and other defendants on January 9, 2017. *Cty. of Barnstable, Mass. v. 3M Co.*, No. 4:17- cv-40002 (D. Mass.) (Casper, J.).  Defendants filed their respective motions to dismiss on or around March 20, 2017.  On December 18, 2017, the court granted in part and denied in part Defendants' motions and allowed Barnstable to amend its complaint to include more specific factual allegations relating to which defendants' specific products were used on Barnstable's property.  Barnstable filed its amended complaint on February 8, 2018 and defendants filed their joint motion to dismiss Barnstable's amended complaint on May 15, 2018.  Judge Casper has *not* issued a decision on defendants' joint motion.  On October 10, 2018, defendants filed an unopposed motion to stay Barnstable's case pending this Panel's decision on defendants' motions to transfer pursuant to 28 USC § 1407.  Judge Casper has not yet ruled on that motion to stay.

On February 14, 2018, Westfield filed suit against 3M, Chemguard, Inc. and Tyco Fire Products L.P. *City of Westfield, Mass. v. 3M Co.*, No. 3:18-cv-30027 (D. Mass.) (Casper, J.). Defendants filed their joint motion to dismiss on May 15, 2018 arguing, among other things, that

the District of Massachusetts does not have jurisdiction.  Judge Casper has *not* issued a decision on

defendants' motion.  On October 10, 2018, defendants also filed an unopposed motion to stay

Westfield's case pending this Panel's decision on defendants' motions to transfer pursuant to 28

USC § 1407.  Judge Casper has not yet ruled on that motion.

Defendants greatly exaggerate the posture of Westfield's and Barnstable's respective cases.

Neither is "well into the litigation process" and although motions to dismiss are pending, this "is

not an impediment to transfer of actions, because such motions can be addressed to the transferee

judge for resolution after transfer." Manual for Complex Litig. (4th ed.) § 20.131.

> **D.   In the Alternative, Judge Marbly is Well- Qualified to Manage the PFAS Litigation.**

In the alternative, Judge Marbly in the Southern District of Ohio would also be an

excellent choice for this MDL as he presided over *The Little Hocking Water Ass'n., Inc. v. E.I.*

*du Pont de Nemours & Co*., No. 2:09-cv-1081 (S.D. Ohio).  Thus, for many of the same reasons

that Chief Judge Sargus is qualified, Judge Marbly is also qualified and the same advantages with

conducting the coordinated proceeding in the Southern District of Ohio apply.

## III.   CONCLUSION

As discussed above, Westfield and Barnstable agree that a PFAS MDL should be created

that incorporates *all* PFAS cases, and *not* just AFFF cases.  Furthermore, there is simply no other

judge in the country who is more familiar with environmental litigation relating to PFAS and the

specific legal, scientific and evidentiary issues involved in PFAS cases than Chief Judge Sargus.

Therefore, considering the common issues involved with all PFAS related cases and Chief Judge

Sargus' unparalleled experience with PFAS litigation and MDLs and because "[p]laintiffs' choice

of forum is . . . entitled to substantial deference," Manual for Complex Litig. (4th ed.) § 20.12

(citation omitted), Westfield and Barnstable respectfully request that the Panel consolidate the

cases subject to Defendants' transfer motions to the Southern District of Ohio before Chief Judge

Sargus.


Respectfully submitted,

Dated: October 19, 2018

*/s/ Richard Head*

Richard W. Head (NH Bar #7900)
Of Counsel
SL ENVIRONMENTAL LAW GROUP PC
201 Filbert Street, Suite 401
San Francisco, CA 94133
Tel. (415) 625-1737
Fax. (415) 384-8333
Email. rhead@slenvironment.com

***Attorney for Plaintiffs Barnstable County and City
of Westfield***